**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ERICK ENCARNACION,**<br><br>Plaintiff,<br><br>-against-<br><br>**THE UNITED STATES OF AMERICA,**<br><br>Defendant. | Case No. ____-cv-____<br><br>COMPLAINT<br><br>(Federal Tort Claims Act) |

## COMPLAINT FOR DAMAGES

(Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680)

**Plaintiff ERICK ENCARNACION**, by and through his attorneys, the Law Office of Andres M. Aranda, with Rudy Velez, Esq., of counsel, brings this action against Defendant **THE UNITED STATES OF AMERICA** under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, and alleges as follows:

## I.
## PRELIMINARY STATEMENT

1. This action arises from the unjustified shooting of Plaintiff Erick Encarnacion, an unarmed twenty-six-year-old rear-seat passenger, by Leon Wilson, an on-duty Federal Bureau of Prisons ("BOP") correctional officer, on September 4, 2023.

2. At all relevant times, Officer Wilson was on duty, in uniform, armed with a BOP-issued semiautomatic handgun, and operating a BOP government vehicle assigned to Outpost Perimeter 1 ("OP1") at the Metropolitan Detention Center in Brooklyn ("MDC-Brooklyn").

3. Wilson pursued a civilian BMW sedan from MDC-Brooklyn through the public streets of Brooklyn in response to what he believed and claimed was an escape attempt or contraband threat to the institution. Although the pursuit and use of deadly force violated governing limits on Wilson's authority, his stated objective concerned MDC-Brooklyn's institutional security rather than a personal dispute or private purpose.

4. During the pursuit, Officer Wilson drove the BOP van at approximately fifty-five miles per hour in a twenty-five-mile-per-hour zone, ran red traffic signals, and endangered other motorists. Near 498 Hamilton Avenue, he fired his BOP-issued weapon toward the rear and rear-right side of the fleeing BMW.

5. ShotSpotter detected at least three shots in rapid succession. Forensic evidence documented at least six bullet defects in the BMW, and Wilson testified that at least six rounds were missing from his service weapon after the incident. Trial Tr. 1175 (Oct. 27, 2025).

6. One bullet entered the BMW and struck Plaintiff in the right midback. Plaintiff was unarmed, displayed no weapon, made no threat, and posed no imminent threat of death or serious physical injury to Wilson or anyone else.

7. Plaintiff sustained a right hemopneumothorax, pulmonary laceration and contusions, a comminuted right third-rib fracture, extensive subcutaneous emphysema, and retained ballistic material in his chest, right pectoral region, and right paraspinal musculature. He required emergency chest-tube placement, admission to the Surgical Intensive Care Unit, and hospitalization from September 4 through September 8, 2023.

8. Plaintiff's treating trauma attending physician, Marko Bukur, M.D., characterized the injuries as "life threatening." Plaintiff also exhibited severe post-traumatic stress symptoms during his hospitalization.

9. Wilson did not summon medical assistance, notify the NYPD, report the firearm discharge, or alert a supervisor. Upon returning to MDC-Brooklyn, he told a colleague that he had done a "good job" and that "no one is going to introduce contraband in the institution."

10. A federal jury subsequently convicted Wilson of willfully depriving Plaintiff of a constitutional right under color of federal law, with findings that Wilson used a dangerous weapon and caused bodily injury, and of discharging a firearm during a crime of violence. United States v. Wilson, No. 24-CR-465 (PKC) (E.D.N.Y.).

11. On June 8, 2026, the Honorable Pamela K. Chen denied Wilson's motion for a judgment of acquittal or a new trial. The criminal record, including Wilson's sworn testimony and the Court's Memorandum and Order, provides substantial evidence concerning the shooting, the lack of lawful justification, causation, and bodily injury.

12. The criminal trial produced an extensive evidentiary record, including testimony from Plaintiff, Wilson, BOP personnel, an MDC-Brooklyn armorer, and Plaintiff's treating trauma surgeon, as well as surveillance footage, forensic photographs, and acoustic gunshot-detection evidence.

13. Wilson testified that he had perceived a possible escape or contraband threat and understood himself to be invoking BOP institutional authority. He also acknowledged the governing restrictions on deadly force, the territorial limits on BOP arrest authority, and the obligation to report a firearm discharge.

14. Plaintiff relies on that criminal record as admissible evidence supporting his state-law tort claims. Plaintiff does not allege that the criminal verdict, standing alone, adjudicated every distinct element of FTCA liability, including scope of employment under New York law or the application of every statutory exception.

15. Plaintiff timely presented a written administrative claim to the BOP seeking $100,000,000 in damages. BOP denied the claim by letter dated April 20, 2026. This action follows that final denial.

## II.
## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1346(b)(1) because Plaintiff asserts claims for money damages arising from the wrongful acts or omissions of a federal employee acting within the scope of employment, under circumstances in which a private person would be liable under New York law.

17. The United States is the proper defendant for the FTCA claims asserted here. The BOP is an agency of the United States Department of Justice.

18. Venue is proper in this District under 28 U.S.C. § 1402(b) because the acts and omissions giving rise to this action occurred in the Eastern District of New York, including at MDC-Brooklyn and on public streets in Brooklyn. Plaintiff resides in Bronx County, within the Southern District of New York.

19. Plaintiff's claims are timely under 28 U.S.C. § 2401(b) because the BOP received his administrative claim within two years of the incident and this action is commenced within six months after the agency mailed its final denial.

## III.
## ADMINISTRATIVE EXHAUSTION

20. On or about August 10, 2025, Plaintiff presented to the BOP Northeast Regional Office a Standard Form 95 concerning the September 4, 2023 shooting and demanding the sum certain of $100,000,000. The agency received the claim on or about August 20, 2025. The Standard Form 95 and proof of receipt are attached as Exhibit A.

21. Plaintiff submitted supporting materials including certified Bellevue Hospital records, medical authorizations, criminal-court records, and documentation concerning his claimed economic losses.

22. By letter dated April 20, 2026, the BOP denied Plaintiff's administrative claim, stating that there was "insufficient evidence to substantiate the allegations" and "no evidence Plaintiff experienced a compensable loss as the result of the acts committed by the BOP employee, Wilson." The denial letter is attached as Exhibit B.

23. The denial constitutes a final written denial within the meaning of 28 U.S.C. § 2675(a). All conditions precedent to this action have occurred, been performed, or been satisfied.

**A. Supporting Administrative and Criminal Record**

24. The November 14, 2024 indictment in United States v. Wilson, No. 24-CR-465 (PKC), is attached as Exhibit C. The indictment reflects the charges returned by the grand jury; Plaintiff relies on the subsequent verdict and post-trial record, rather than the indictment alone, as proof of the underlying conduct.

25. The Government's sentencing or post-trial submission describing the offense conduct and bodily injury is attached as Exhibit D. The submission is evidence of the positions taken by

federal prosecutors in the criminal proceeding, subject to the Federal Rules of Evidence and any ruling of this Court.

26. Relevant excerpts from Wilson's October 27, 2025 trial testimony are attached as Exhibit E. Among other things, Wilson addressed his use of the BOP vehicle and weapon, his claimed institutional purpose, the restrictions on deadly force and off-property authority, and his failure to report missing rounds.

27. Dr. Bukur, plaintiff's treating physician, at Officer Wilson's criminal trial described Plaintiff's injuries, emergency treatment, and the life-threatening nature of the gunshot trauma.

28. Judge Chen's June 8, 2026, wrote a Memorandum and issued an Order denying Wilson's motion for judgment of acquittal or a new trial. That decision summarizes portions of the developed trial record and confirms the legal sufficiency of the evidence supporting the criminal verdict.

29. BOP Armorer Salvatore Auteri's testified at the criminal trial and his testimony are described the reporting and inspection process applicable when an on-duty officer discharges an assigned firearm.

30. Plaintiff will produce and rely on complete, authenticated versions of the foregoing materials as required. Quotations and transcript citations in this Complaint are intended to correspond to those exhibits and must be read in their full context.

## IV.
## PARTIES

31. Plaintiff ERICK ENCARNACION is a United States citizen and lifelong New York City resident who resides in Bronx County. Plaintiff has a developmental disability.

32. Defendant THE UNITED STATES OF AMERICA is liable under the FTCA, subject to its terms and exceptions, for covered torts of federal employees acting within the scope of their employment under circumstances in which a private person would be liable under applicable state law.

33. Federal Correction Officer Leon Wilson was employed at all relevant times by the BOP as a correctional officer assigned to MDC-Brooklyn.

## V.
## FACTUAL ALLEGATIONS

### A. Governing Policies and Wilson's Assignment

34. The Department of Justice, BOP, and MDC-Brooklyn maintained written policies governing deadly force, firearm use, off-property arrest authority, occupation of armed perimeter posts, and reporting of firearm discharges.

35. The DOJ Use of Force Policy permitted deadly force only when an officer reasonably believed the subject posed an imminent danger of death or serious physical injury. It prohibited deadly force solely to prevent the escape of a fleeing suspect, solely to disable a moving vehicle, and warning shots outside the prison context.

36. The policy also restricted firing from a moving vehicle to narrowly defined exigent circumstances and required an articulable reason for that extraordinary use of deadly force. Correctional officers were not trained to use firearms from moving vehicles as an ordinary method of stopping a suspect.

37. Wilson confirmed at trial that he was not permitted to use deadly force to frighten someone, to stop a fleeing suspect absent an actual threat, solely to disable a moving vehicle, or to fire warning shots near MDC-Brooklyn. Trial Tr. 1102–1104.

38. Wilson received the updated policy and completed recurring use-of-force instruction. At trial, he acknowledged training in de-escalation and in using only the minimum force necessary as a last resort.

39. BOP policy authorized warrantless arrests off BOP property only in specified circumstances and required probable cause rather than reasonable or mere suspicion. Suspected contraband delivery was not itself one of the enumerated grounds for an off-property warrantless arrest.

40. The enumerated circumstances included an assault on an officer, escape of a prisoner in custody, instigating or assisting an escape, and escape of a recalcitrant witness. The written policy stated that reasonable suspicion and mere suspicion were insufficient.

41. BOP policy also required an on-duty officer to report a firearm discharge promptly so that the weapon could be taken offline and inspected. BOP Armorer Salvatore Auteri described that reporting and inspection protocol at Wilson's criminal trial. Trial Tr. 1192–1194.

42. MDC-Brooklyn post orders prohibited an officer assigned to a critical post from leaving without proper relief or instruction. Wilson acknowledged those post orders in writing in June 2023.

43. The post orders required officers to notify the on-duty lieutenant and command-room officer of unusual incidents, exercise judgment through the chain of command, and prepare required incident reports. Armed perimeter posts were treated as critical to institutional security.

44. On September 4, 2023, Wilson was assigned to OP1 from 12:00 a.m. to 12:00 p.m. OP1 was a critical, armed perimeter post overlooking MDC-Brooklyn's rear gate and was ordinarily designated as a walking post.

45. MDC-Brooklyn housed approximately 1,200 to 1,500 federal detainees at the time and employed correctional personnel assigned to interior and exterior security posts. The facility was reportedly short at least one exterior staff member during Wilson's shift.

46. Wilson nevertheless signed out and operated the White BOP Van through the institution's normal vehicle procedure. He testified that using the vehicle was something he normally did when the institution was short-staffed. Trial Tr. 1041.

**B. Events Preceding the Pursuit**

47. At approximately 4:35 a.m., Wilson drove the White BOP Van to a nearby subway station and purchased a MetroCard, in violation of the applicable post order. He remained on duty, in uniform, armed with his service weapon, and in possession of the BOP vehicle.

48. At approximately 4:40 a.m., a gray BMW sedan entered the MDC-Brooklyn staff parking lot and remained there for several minutes. Three people occupied the BMW: the driver, front-seat passenger Kaylyn Nunez, and Plaintiff, seated in the rear middle seat.

49. The occupants intended to deliver marijuana, cigarettes, and cellular telephones to a detainee inside MDC-Brooklyn. None of the occupants was armed, and no occupant displayed a weapon or threatened Wilson.

50. Senior Officer Specialist Ezequiel Santiago was present in the staff parking area. He did not see anyone exit the BMW, did not observe a rope descending from the facility, and could not see the occupants through the tinted windows.

51. Wilson returned to MDC-Brooklyn, watched the BMW from across the street, then drove the White BOP Van into the parking lot and positioned it to block the BMW's exit. The BMW drove away from the facility.

52. Wilson did not report his observations through the command structure before leaving MDC-Brooklyn property. He did not request an authorized law-enforcement response, ask another officer to secure OP1, or communicate a description of a suspected escapee.

53. Rather than notify the command structure, request assistance, or contact the NYPD, Wilson pursued the BMW in the BOP vehicle. Wilson later testified that he believed he was responding to an escape or institutional-security emergency and was acting pursuant to BOP authority rather than for personal reasons. Trial Tr. 1137–1140.

**C. Pursuit and Shooting**

54. Wilson pursued the BMW for more than a mile through Sunset Park and Downtown Brooklyn. A license-plate reader recorded the White BOP Van traveling approximately fifty-five miles per hour in a twenty-five-mile-per-hour zone. Wilson ran red lights and narrowly avoided other motorists.

55. Surveillance evidence showed Wilson changing lanes around stopped traffic and passing close to a person operating an electric scooter. The pursuit occurred on public streets open to ordinary civilian traffic.

56. At approximately 4:47 a.m., near 498 Hamilton Avenue, Officer Wilson discharged his BOP-issued firearm toward the rear of the BMW while both vehicles were moving.

57. ShotSpotter detected at least three shots in rapid succession. Forensic photographs documented at least six bullet defects in the rear and right-rear passenger area of the BMW. Wilson testified that at least six rounds were missing from his service weapon afterward. Trial Tr. 1175.

58. The BMW was moving away from Wilson. Plaintiff was unarmed, displayed no weapon, made no threat, and was not operating the vehicle. No occupant possessed a firearm.

59. Correctional Officer Wilson later claimed that he saw a gun emerge from the BMW. The criminal-trial record included contrary testimony and physical evidence, and the jury rejected Wilson's justification beyond a reasonable doubt in returning the § 242 verdict.

60. One bullet passed through the BMW and struck Plaintiff in the right midback. Plaintiff experienced burning pain, difficulty breathing, lightheadedness, and intermittent loss of consciousness.

61. Plaintiff ducked in the rear seat because, as he testified, "they kept shooting." The quotation reflects Plaintiff's perception during the event and does not allege that any identified person other than Wilson fired a weapon.

62. Wilson continued the pursuit before returning to MDC-Brooklyn. He did not summon medical assistance, call 911, notify the NYPD, report his firearm discharge, or notify a supervisor.

**D. Conduct After the Shooting**

63. Upon returning, Wilson appeared "happy" and "accomplished" to Senior Officer Specialist Ezequiel Santiago. Wilson said he had done a "good job" and that "no one is going to introduce contraband in the institution, you know, we're not going to allow that."

64. Those statements are evidence that Wilson understood his actions as directed toward MDC-Brooklyn's institutional-security mission rather than a personal dispute.

65. Wilson failed to report that his service weapon was missing rounds, contrary to the mandatory reporting and inspection protocol. Trial Tr. 1175–1176.

66. The service weapons inspected after MDC-Brooklyn learned of the incident did not appear to have been fired recently. Plaintiff alleges that the criminal evidence supports an inference that Wilson cleaned the weapon and replenished the missing rounds before the inspection.

67. The Warden directed personnel to preserve potential evidence, including the White BOP Van and firearms assigned to armed posts during the shift.

68. MDC-Brooklyn learned of the shooting only after the NYPD traced the White BOP Van's government license plate to the BOP.

**E. Pre-Incident and Subsequent Conduct Relevant to Notice and Intent**

69. In the weeks before September 4, 2023, Wilson allegedly told inmate Dylan Carreras that a female civilian who had previously entered MDC-Brooklyn property would be shot in the head if she returned. Wilson allegedly made the statement while on duty, armed, and resting a hand on his service weapon.

70. Carreras also testified concerning an occasion when Wilson drew his service weapon, manipulated the slide, ejected a live round, retrieved it, and placed it in his pocket after Carreras questioned whether the firearm contained live ammunition.

71. Plaintiff alleges those incidents as evidence concerning Wilson's familiarity with and attitude toward his firearm and, only to the extent BOP personnel knew or should have known of them before the shooting, as potential notice relevant to Plaintiff's alternative direct-negligence theories.

72. The present record must establish when the incidents occurred, whether they were witnessed or reported to BOP personnel, whether any contemporaneous documentation exists, and what

response—if any—was required before they may support negligent-retention, supervision, or entrustment liability.

73. On the night following the shooting, Wilson allegedly conducted an unauthorized off-property stop-and-frisk and later prepared a report placing the encounter on BOP property. That subsequent event could not have provided pre-shooting notice, but Plaintiff alleges it as potential evidence of Wilson's practices and credibility, subject to relevance and admissibility rulings.

**F. Plaintiff's Emergency Treatment and Injuries**

74. EMS transported Plaintiff to Bellevue Hospital Center, where he arrived at 5:19 a.m. as a Level 1 trauma activation with a gunshot wound to the right midback, shortness of breath, and chest pain.

75. The trauma team documented decreased breath sounds on the right and a positive E-FAST examination reflecting absent right-lung sliding. Emergency intervention proceeded because of the acute thoracic injury.

76. At approximately 6:02 a.m., physicians performed an emergency right tube thoracostomy and inserted a 16-French chest tube, which drained approximately 1,200 cubic centimeters of bloody output.

77. Imaging showed a right hemopneumothorax, a right upper-lobe pulmonary laceration, right middle- and lower-lobe pulmonary contusions, an acute comminuted right anterior third-rib fracture, partial atelectasis, and extensive subcutaneous emphysema.

78. Imaging also identified a retained 1.4-centimeter projectile in the right lateral chest wall near the axilla, a 1.1-centimeter fragment in the right pectoralis musculature, and punctate fragments in the right paraspinal musculature at T10–T11.

79. The allegations concerning the number, size, and location of retained projectiles and fragments are based on the certified radiology records and should be distinguished from the separate number of shots detected or bullet defects documented in the BMW.

80. Dr. Bukur characterized Plaintiff's injuries as life threatening. Plaintiff required Surgical Intensive Care Unit admission and remained hospitalized until September 8, 2023.

81. Plaintiff alleges that retained ballistic material remains in his body. The medical proof will establish whether removal is contraindicated, what continuing symptoms are causally related to the fragments, and whether future monitoring or treatment is necessary.

82. During the hospitalization, Plaintiff scored 60 on the PTSD Checklist—Civilian Version, reflecting severe post-traumatic stress symptoms including hyperarousal, emotional reactivity, and dissociation.

83. The PCL-C score reflects a contemporaneous trauma screening. Plaintiff will establish any continuing diagnosis, treatment, functional limitation, and prognosis through current mental-health evidence rather than relying solely on the inpatient screening.

84. Plaintiff continues to allege physical pain, psychological injury, medical expenses, lost earnings, impaired earning capacity, and loss of enjoyment of life. The extent and permanency of those injuries will be established through medical, vocational, economic, and other admissible evidence.

**G. Criminal Prosecution and Trial Record**

85. On September 30, 2024, a criminal complaint was unsealed in this District charging Wilson with deprivation of rights under color of law in violation of 18 U.S.C. § 242.

86. On November 14, 2024, a federal grand jury returned an indictment in United States v. Wilson, No. 24-CR-465 (PKC), charging deprivation of rights under color of law, with dangerous-weapon and bodily-injury allegations, and discharging a firearm during a crime of violence under 18 U.S.C. § 924(c).

87. The criminal case was assigned to Judge Chen. The Government prosecuted the case through Assistant United States Attorneys and presented evidence developed by federal investigators and BOP witnesses.

88. Wilson proceeded to a contested jury trial at which he was represented by counsel, testified, presented evidence, and asserted that he acted in self-defense and in response to a perceived escape.

89. Witnesses included Plaintiff, Santiago, MDC-Brooklyn supervisory and security personnel, Auteri, Carreras, and Dr. Bukur. The trial record also included surveillance video, forensic photographs, ShotSpotter evidence, government-vehicle evidence, and BOP policies and post orders.

90. Wilson testified that he observed a rope descending from the detention facility, believed an escape might be underway, pursued the BMW to interrupt that event, and fired after seeing what he claimed was a weapon protruding from the vehicle.

91. Other evidence contradicted material portions of that account. Santiago did not observe a rope or anyone exiting the vehicle; the occupants were unarmed; Wilson acknowledged that he did not actually see contraband or a person in inmate clothing; and his immediate post-incident statements reportedly did not mention an escape.

92. The Government argued in its post-trial submission that the evidence established willfulness, use of a dangerous weapon, and bodily injury. Those arguments and the supporting record are relevant evidentiary materials, although the criminal prosecution did not adjudicate every separate issue of civil FTCA liability.

93. On October 28, 2025, the jury found Wilson guilty on both counts and found that the § 242 offense involved a dangerous weapon and resulted in bodily injury.

94. Wilson was remanded to federal custody. His sentencing and appellate status must be updated as of the date this Complaint is filed.

95. On June 8, 2026, Judge Chen denied Wilson's post-trial motion for judgment of acquittal or a new trial. The Court's Memorandum and Order is attached as Exhibit G.

96. The conviction and post-trial decision do not themselves determine every element of FTCA liability, but the criminal record constitutes substantial evidence concerning Wilson's conduct, the absence of lawful justification, the discharge of his BOP-issued firearm, causation, and Plaintiff's bodily injury.

**H. Scope of Employment Under New York Law**

97. New York determines scope of employment by considering the connection between the time, place, and occasion for the act; the parties' employment relationship in actual practice; whether the general act was one commonly performed by the employee; the extent of departure from normal methods; and whether the general type of conduct was reasonably foreseeable. Riviello v. Waldron, 47 N.Y.2d 297, 303–04 (1979).

98. Intentional misconduct and violation of employer rules do not automatically place conduct outside the scope of employment where the general conduct was a foreseeable incident of the employment and was motivated, at least in part, by a purpose to serve the employer. See Rivera v. State, 34 N.Y.3d 383, 389–90 (2019).

99. Here, Wilson was on duty during his assigned shift, in uniform, armed with a BOP-issued service weapon, and operating a BOP vehicle signed out through the institution's ordinary procedure.

100. The time-and-occasion factor therefore supports an employment connection: the incident occurred during Wilson's scheduled twelve-hour shift and arose immediately after he returned to the facility in the assigned government vehicle.

101. The place factor is mixed. The encounter began on MDC-Brooklyn property but continued more than a mile onto public streets where Wilson allegedly lacked authority to pursue a suspected contraband vehicle. Plaintiff acknowledges that geographic departure while alleging that it resulted from Wilson's continuing response to the perceived institutional event.

102. The employment relationship in actual practice also requires factual development. OP1 was officially a walking post, but Wilson testified that he normally signed out the BOP van when the institution was short-staffed. That testimony supports an inference that vehicle use at the post was tolerated in practice despite the written designation.

103. Responding to threats affecting inmate custody, perimeter security, institutional contraband, and the facility's rear gate fell generally within a correctional officer's employment responsibilities. A high-speed off-property pursuit and firearm discharge were substantial departures from authorized methods, but the relevant New York inquiry considers the general type of conduct as well as the wrongful manner of performance.

104. During the pursuit and shooting, Wilson claimed to be responding to an escape or contraband threat to MDC-Brooklyn. His sworn testimony and his statement after the pursuit support the inference that his purpose, however misguided and unlawful his methods, was connected to the institutional-security function for which BOP employed and armed him.

105. The evidence does not describe a private quarrel, personal enemy, personal financial objective, or wholly unrelated destination motivating the pursuit. Wilson's expressed purpose concerned institutional contraband and custody security.

106. BOP placed Wilson in an armed perimeter-security role where the potential use of force in response to a perceived institutional threat was not wholly unforeseeable, even though the particular pursuit and shooting departed substantially from authorized methods.

107. In use-of-force cases, New York law also considers whether the employee was authorized to use some degree of force to accomplish employment duties. BOP issued Wilson a loaded service weapon for an armed perimeter assignment, while strictly limiting when and how deadly force could be used.

108. The pre-pursuit MetroCard trip presents a separate personal deviation. Plaintiff alleges that any personal detour ended when Wilson returned to MDC-Brooklyn and responded to the BMW. Plaintiff does not rely merely on Wilson's uniform or equipment, but on the alleged institutional purpose of the later pursuit.

109. Accordingly, Plaintiff alleges that Wilson acted within the scope of his BOP employment during the pursuit and shooting. Plaintiff pleads direct-negligence theories against the United States in the alternative to the extent permitted by the FTCA and New York law.

**I. Discretionary-Function Exception**

110. The FTCA's law-enforcement proviso does not categorically override the discretionary-function exception. Martin v. United States, 605 U.S. 400, 404–11 (2025).

111. Accordingly, Plaintiff must identify conduct that was not the product of a permissible policy judgment or that violated a specific directive leaving no lawful choice. The mere fact that conduct was wrongful or unconstitutional does not by itself answer the statutory inquiry.

112. The discretionary-function exception does not apply, however, when a federal statute, regulation, or policy specifically prescribes a course of action and leaves the employee no lawful choice. Berkovitz v. United States, 486 U.S. 531, 536 (1988); United States v. Gaubert, 499 U.S. 315, 322 (1991).

113. Plaintiff alleges that the challenged pursuit and use of deadly force violated specific mandatory limitations, including categorical prohibitions against deadly force absent an imminent threat, deadly force solely to stop a fleeing suspect, firearm use solely to disable a moving vehicle, and off-property warrantless arrests for suspected contraband delivery without statutory or policy authority.

114. Plaintiff further alleges that the reporting and weapon-inspection rules imposed mandatory post-discharge obligations. Those later violations are relevant to concealment and evidentiary issues, although Plaintiff does not allege that a reporting failure occurring after the shooting independently caused the original gunshot injury.

115. To the extent any direct-negligence theory challenges policy-based decisions entrusted to agency discretion, Plaintiff pleads that theory only insofar as discovery establishes violation of a specific mandatory directive or conduct otherwise outside the exception.

**J. Evidentiary Effect of the Criminal Proceeding**

116. The jury verdict necessarily determined beyond a reasonable doubt that Wilson willfully deprived Plaintiff of a federal right under color of law, used a dangerous weapon, caused bodily injury, and discharged a firearm during the charged crime of violence.

117. Those determinations and the supporting criminal record strongly corroborate Plaintiff's allegations that the shooting was intentional, unjustified, and causally connected to his bodily injuries.

118. The United States was the prosecuting sovereign in the criminal case, while Wilson was the criminal defendant represented by separate counsel. The criminal proceeding did not adjudicate scope of employment under New York respondeat-superior law, the private-person analogue, the discretionary-function exception as applied to each civil theory, or the amount of compensatory damages.

119. Plaintiff therefore relies on the verdict, testimony, exhibits, post-trial submissions, and Wilson Memorandum and Order according to their proper evidentiary and preclusive effect as determined by this Court, without alleging that damages are the only issue remaining for adjudication.

120. Nothing in this pleading prevents Plaintiff from seeking appropriate issue preclusion on a developed motion if the governing standards, identity of issues, finality, party relationship, and fairness requirements are established.

## VI.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Assault and Battery — 28 U.S.C. §§ 1346(b), 2680(h))

121. Plaintiff repeats and realleges the preceding paragraphs.

122. Wilson was an "investigative or law enforcement officer" within 28 U.S.C. § 2680(h) because federal law empowered him to execute searches, seize evidence, or make arrests for violations of federal law. See Millbrook v. United States, 569 U.S. 50, 54–57 (2013); 18 U.S.C. § 3050.

123. The law-enforcement proviso applies to the listed intentional torts committed by a qualifying officer acting within the scope of office or employment, regardless of whether the officer was engaged in a search, seizure, or arrest at the precise moment of the tort.

124. Wilson intentionally and without privilege or consent caused harmful and offensive bodily contact by firing his BOP-issued weapon into the BMW and striking Plaintiff.

125. The same conduct placed Plaintiff in apprehension of continuing harmful contact as he ducked in the rear seat while shots were fired toward the vehicle.

126. Plaintiff was unarmed, displayed no weapon, made no threat, and posed no imminent threat of death or serious physical injury. The BMW was moving away when Wilson fired. Wilson therefore lacked lawful justification or privilege to use deadly force against Plaintiff.

127. Wilson committed the assault and battery while acting within the scope of his BOP employment for the reasons alleged above. The United States is liable under the FTCA and New York law for the resulting compensatory damages.

**SECOND CAUSE OF ACTION**
(Negligence and Gross Negligence — Pleaded in the Alternative)

128. Plaintiff repeats and realleges the preceding paragraphs.

129. In the alternative to the intentional-tort theory, Wilson owed Plaintiff and the public a duty to exercise reasonable care in operating the BOP vehicle, conducting any pursuit, handling his service weapon, and responding to a perceived institutional-security threat.

130. A private employer and its employee operating a vehicle and handling a dangerous instrumentality under comparable circumstances would be required by New York law to exercise reasonable care toward passengers and members of the public.

131. Wilson breached that duty by, among other things, driving approximately fifty-five miles per hour in a twenty-five-mile-per-hour zone, running red lights, pursuing the BMW without requesting assistance or notifying the NYPD, and discharging a firearm from a moving vehicle toward another moving vehicle containing unarmed occupants.

132. The foregoing conduct was a direct and proximate cause of Plaintiff's bodily injuries and other compensatory damages.

133. Plaintiff pleads negligence in the alternative and does not allege that the same firearm discharge was simultaneously accidental and intentional. The particular theory applicable to each act will depend on the evidence and governing New York law.

134. To the extent this count depends on conduct governed by mandatory directives rather than protected policy judgment, it is not barred by 28 U.S.C. § 2680(a).

**THIRD CAUSE OF ACTION**
(Negligent Retention, Supervision, and Entrustment — Pleaded in the Alternative)

135. Plaintiff repeats and realleges the preceding paragraphs.

136. BOP owed a duty, to the extent imposed by New York law and not barred by an FTCA exception, to exercise reasonable care before retaining Wilson in an armed perimeter assignment and entrusting him with a loaded service weapon and government vehicle.

137. In the weeks before the shooting, Wilson allegedly threatened to shoot a civilian while on duty and armed and displayed a live round from his service firearm to an inmate. Plaintiff alleges, upon information and belief, that discovery will establish whether those incidents were reported, documented, witnessed by BOP personnel, or otherwise known to supervisors before September 4, 2023.

138. If BOP had pre-incident notice of conduct demonstrating Wilson's unfitness for armed perimeter duty and failed to take action required by a specific nondiscretionary directive, that failure constituted negligence and proximately contributed to Plaintiff's injuries.

139. This count is pleaded in the alternative and is limited to theories supported by proof of pre-incident notice, an applicable private-person duty under New York law, administrative presentment, and conduct outside the discretionary-function exception.

**FOURTH CAUSE OF ACTION**
(Negligent Entrustment — Pleaded in the Alternative)

140. Plaintiff repeats and realleges the preceding paragraphs.

141. BOP entrusted Wilson with a loaded semiautomatic service weapon and access to the White BOP Van for use during an armed perimeter-security assignment.

142. Under New York law, a private person who supplies a vehicle or dangerous instrumentality to an individual known to be incompetent, unfit, or likely to use it dangerously may be liable for foreseeable resulting harm.

143. Plaintiff alleges this count only to the extent discovery establishes that authorized BOP decisionmakers possessed pre-shooting information demonstrating Wilson's unfitness for the armed assignment and nevertheless entrusted him with the weapon or vehicle contrary to an applicable duty outside the discretionary-function exception.

144. Wilson's undisclosed MetroCard trip on the same shift cannot by itself establish BOP's prior knowledge. Plaintiff instead relies on any admissible proof that earlier threatening or firearm-related conduct was reported, documented, or known before September 4, 2023.

145. The entrustment was a substantial factor in allowing Wilson to conduct the pursuit and fire the weapon that injured Plaintiff.

146. This count is pleaded in the alternative to respondeat-superior liability and remains subject to proof of administrative presentment, a New York private-person analogue, actual or constructive notice, causation, and an applicable FTCA waiver.

**VII.**
**DAMAGES**

147. As a direct and proximate result of the acts and omissions alleged, Plaintiff sustained severe bodily injury, including a gunshot wound, hemopneumothorax, pulmonary laceration and contusions, rib fracture, subcutaneous emphysema, retained ballistic material, physical pain, and hospitalization.

148. Plaintiff endured emergency invasive treatment, including tube thoracostomy and drainage of approximately 1,200 cubic centimeters of bloody output, Surgical Intensive Care Unit admission, diagnostic imaging, medication, observation, and follow-up care.

149. Plaintiff also alleges past and future emotional distress and post-traumatic stress symptoms; past and future medical, rehabilitative, pharmaceutical, and mental-health expenses; past and future lost earnings and impaired earning capacity; and loss of enjoyment of life.

150. Plaintiff alleges that his developmental disability increased his vulnerability to the psychological consequences of the shooting. The relevance and extent of that effect will be established through competent evidence rather than assumption.

151. At the time of the shooting, Plaintiff reportedly worked as a delivery driver and personal shopper. Wage loss and impaired earning capacity will be supported by employment, income, medical, vocational, and economic proof.

152. Plaintiff seeks damages for past and future physical pain and suffering, mental anguish, anxiety, trauma, scarring or physical limitation shown by the evidence, reasonable medical expenses, wage loss, diminished earning capacity, and loss of enjoyment of life.

153. Plaintiff's administrative claim demanded the sum certain of $100,000,000. Plaintiff seeks compensatory damages up to the amount permitted by 28 U.S.C. § 2675(b), in an amount to be determined by the Court from the admissible evidence.

## VIII.
## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against the United States as follows:

(a) Compensatory damages in an amount determined by the Court, subject to 28 U.S.C. § 2675(b);

(b) Taxable costs and post-judgment interest as permitted by law; and

(c) Such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 2402, Plaintiff makes no demand for a jury trial on the FTCA claims asserted in this Complaint.

Dated: August 19, 2026
Bronx, New York

*Respectfully submitted,*

**LAW OFFICE OF ANDRES M. ARANDA**
/s/ Andres M. Aranda
**ANDRES M. ARANDA, ESQ.**
Attorney for Plaintiff Erick Encarnacion
930 Grand Concourse, Suite 1A
Bronx, New York 10451
Tel.: (718) 541-9244
Email: Arandaoffice@gmail.com

EXHIBIT A

Andres Manuel Aranda

Attorney-at-law Abogado

930 Grand Concourse, Suite 1A

Bronx, New York 10451

1-718-541-9244

amarandawill.c.u@gmail.com

Federal Bureau of Prisons

Mid-Atlantic Regional Office

302 Sentinel Drive # 200 August 11, 2025

Annapolis Junction, MD 20701

Re: Claim of Erick Encarnacion

Dear Sir/Madam:'

Greetings.

I have been retained to represent Mr. Erick Encarnacion.

Mr. Encarnacion was shot by a correctional officer in the employment of the Bureau of Prisons, LEON WILSON. This unfortunate incident happened while Mr. Wilson was on duty at the Brooklyn Metropolitan Detention Center on 29 Street.

I have attached the following: 1. Claim Form (Form 95); 2. A HIPPA medical release form; 3. Several News Articles, and 4. An addendum which gives a more complete narrative of the events.

Please feel free to contact me either by phone, US Mail or email.

Thank you.

Regards,

Andres M. Aranda

| **CLAIM FOR DAMAGE, INJURY, OR DEATH** | **INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| FEDERAL BUREAU OF PRISONS | ERICK ENCARNACION<br>1068 WARD AVE. APT 2B<br>BRONX, NY 10472<br><br>ANDRES M. ARANDA, ESQ.<br>930 GRAND CONCOURSE<br>BRONX, NY 10451 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY ☐ CIVILIAN | 08/06/1997 | SINGLE | 09/04/2023 MONDAY | 4:23 AM |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

WHILE ON DUTY AS AN MDC, BROOKLYN, AND ACTING UNDER COLOR OF LAW, CORRECTIONAL OFFICER LEON WILSON CHASED A VEHICLE THROUGH THE STREETS OF BROOKLYN FOR APPROXIMATELY 5 MILES. WHILE DOING SO,AND WHILE BEHIND THE WHEEL OF A BUREAU OF PRISONS VAN, WILSON RECKLESSLY, WANTONLY AND WITHOUT PROBABLE CAUSE OR JUSTIFCATION, FIRED SEVERAL ROUNDS FROM HIS BOP WEAPON AT THE VEHICLE ENCARNACION WAS A PASSENGER IN. ONE ROUND HIT ENCARNACION IN THE BACK AND THIS ROUND IS

9. **PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

10. **PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

ENCARNACION WAS SHOT IN THE BACK REQUIRING HOSPITALIZATION AT BELLEVUE HOSPITAL IN NY CITY. THE BULLET CAN NOT BE REMOVED SINCE IT IS TOO CLOSE TO THE SPINE AND COULD CAUSE PERMANENT PARALYSIS. MR. ENCARNACION SPENT APPROXIMATELY 2 WEEKS HOSPITALIZED AT BELLEVUE HOSPITAL IN NY CITY. STILL SUFFERS GREAT PAIN AND DISCONFORT AND HAS LIMITED MOVEMENT AND CAN NOT LIFT THINGS.

11. **WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| | |

12. (See instructions on reverse). **AMOUNT OF CLAIM** (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| | $100,000,000.00 | | $100,000,000.00 |

**I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.**

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| Erick Encarnacion | 1-929-571-7457/718-541-9244 | 8/10/25 |

| **CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM** | **CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS** |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident Insurance? ☐ Yes If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☒ No

17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance? ☐ Yes If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

# ADDENDUM

On September 4, 2023, in the early hours of the morning, Leon Wilson was on duty at the Metropolitan Detention Center, MDC, in Brooklyn, New York. He is employed by the BOP as a correctional guard.

While on duty, and acting under color of law, Leon Wilson chased a civilian vehicle through the streets of Brooklyn. Mr. Wilson was driving a Bureau of Prisons van and was armed with a handgun belonging to and provided to him by the BOP.

Mr. Wilson discharged his weapon at the vehicle that he was chasing and one round struck Mr. Erick Encarnacion in the back, causing pain, suffering and permanent damage to him. Mr. Encarnacion was hospitalized at Bellevue Hospital where he remained for approximately two weeks. Because of the location of the bullet in his body, the Doctors were not able to remove it. We understand that they feared causing further, and more catastrophic damage to Mr. Encarnacion.

Mr. Encarnacion is still in pain and his movements are limited. There are many things that he can no longer do, such as engaging in sports. Encarnacion suffers from anxiety and depression as a result of this incident.

At the time that he was shot by this reckless individual, Encarnacion was a passenger in the vehicle being chased and he had not engaged in any activity that required being chased and shot. He did not provoke this wanton, reckless and unjustified shooting, The BOP not only provided its employee, Leon Wilson, with a vehicle and a gun; but it also failed to properly train him. The BOP failed to properly supervise its employee, Mr. Wilson, and is therefore vicariously liable for ALL of his unjustified, reckless, wanton, malicious and anti-social behavior. Wilson drove 5 miles through the civilian population of Brookly disregarding the rules of the road, the safety of the citizens of Brooklyn and the occupants of the vehicle he was chasing.

A federal grand jury found probable cause that Wilson violated the Civil Rights of Mr. Encarnacion and Wilson was indicted for assaulting Encarnacion with a gun.

Wilson is guilty of: Recklessness, Assault, Battery, Causing Pain and Suffering, Causing permanent damage, Causing permanent disfigurement, causing permanent psychological damage, Violating the Civil Rights of Mr. Encarnacion, Violating his Constitutional Rights to be free from harm, to be free from interference, among other rights violated. The United States Attorney's Office for the Eastern District of New York is seriously and vigorously pursuing the case.

**U.S. Department of Justice**

Federal Bureau of Prisons

*Northeast Regional Office*

*U.S. Custom House*
*2nd & Chestnut Streets - 7th Floor*
*Philadelphia, PA 19106*

September 5, 2025

Andres M. Aranda, Esq.
Attorney at Law - Abogado
930 Grand Concourse, Suite 1A
Bronx, NY 10451

Re: Administrative Tort Claim Received August 20, 2025
Filed on Behalf of Erick Encarnacion
Claim No. TRT-NER-2025-08696

Dear Mr. Aranda:

This will acknowledge receipt of the administrative claim you submitted on behalf of Erick Encarnacion, for an alleged personal injury suffered on September 4, 2023.

In accordance with 28 C.F.R. 14.2 (a), in order for me to correspond with you as legal representative for the above claim, I need proof that you are authorized to represent Mr. Encarnacion. Please provide this authorization within 30 days of the date of this letter.

All correspondence regarding this claim should be addressed to Federal Bureau of Prisons, Northeast Regional Office, Room 701, U.S. Custom House, 2nd & Chestnut Street, Philadelphia, Pennsylvania 19106. If the circumstances surrounding this claim change in any fashion, you should contact this office immediately.

Sincerely,

A. M. Johnson
Regional Counsel

I, ERICK ENCARNACION, hereby authorize Mr. Andres M. Aranda, Esq. to represent me as my attorney in a Claim that I filed against the Federal Bureau of Prisons, arising out of an incident on September 4, 2023.

On that date I was injured by being shot in the back by Leon Wilson, an employee of the Federal Bureau of Prisons assigned to work at the Metropolitan Correction Center, MDC, in Brooklyn New York.

Mr. Andres M. Aranda has full authority to speak on my behalf and to correspond with the Representative of the Federal Bureau of Prisons as my Representative.

Erick E

ERICK ENCARNACION

Sworn and subscribed before me on this 8th day,

Day of September, 2025.

Victor J Molina

NOTARY PUBLIC

**Victor J. Molina**
Notary Public, State of New York
No.: 02MO6249338
Qualify in Bronx County
Commission Expires
Nov., 7th 20 27

EXHIBIT D

**Andres M. Aranda Esq.**

**Attorney at Law - Abogado**

Director Bellevue Hospital

462 First Avenue

New York, NY 10016

Re: Erick Encarnacion. November25, 2025

Dear Director:

Greetings.

I represent Mr. Erick Encarnacion in a lawsuit arising out of an incident on or about September 4, 2023.

At that time, Mr. Encarnacion was shot in the back by a then Federal Correction Officer.

Mr. Encarnacion received treatment at Bellevue Hospital, which saved his life.

I am enclosing HIPAA Medical release forms, duly executed by my client, Mr. Encarnacion.

We need the requested medical records to support our case and damages.

I will pay for copying and mailing the records.

Thank you; I look forward to receiving the records.

Kind regards,

Andres M. Aranda

**930 Grand Concourse, Suite 1A**
**Bronx, New York 10451**

**718- 541-9244**
**amarandawill.c.u@gmail.com**

OCA Official Form No.: 9

# AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA

**[This form has been approved by the New York State Department of Health]**

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| Erica Encarnacion | 08-06-1997 | 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 |
| Patient Address: 1066 ward ave | | |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this for

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL** and **DRUG ABUSE, MENTAL HEAL TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV* RELATED INFORMATION** only if I place my initials the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, an initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.
2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipien prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Divis of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies responsible for protecting my rights.
3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I m revoke this authorization except to the extent that action has already been taken based on this authorization.
4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility benefits will not be conditioned upon my authorization of this disclosure.
5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and t redisclosure may no longer be protected by federal or state law.
6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDIC CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

7. Name and address of health provider or entity to release this information:
BELLEVUE HOSPITAL 462 FIRST AVE. NEW YORK, N.Y. 10016

8. Name and address of person(s) or category of person to whom this information will be sent:
ANDRES M. ARANDA 930 GRAND CONCOURSE, 1A BRONX N.Y. 104

9(a). Specific information to be released:

☐ Medical Record from (insert date) 9/4/2023 to (insert date) 11/20/2025

☒ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, fil referrals, consults, billing records, insurance records, and records sent to you by other health care providers.

☐ Other: ______________________

Include: (*Indicate by Initialing*)

______ **Alcohol/Drug Treatment**

______ **Mental Health Information**

______ **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ☐ By initialing here ________ (Initials) I authorize ______________________ (Name of individual health care provider) to discuss my health information with my attorney, or a governmental agency, listed here:

______________________ (Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: ☐ At request of individual ☐ Other: | 11. Date or event on which this authorization will expire: SETTLEMENT OF LAWSUIT |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided copy of the form.

Erica Encarnacion
Signature of patient or representative authorized by law.

Date: 5/29/2025

* **Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably coul identify someone as having HIV symptoms or infection and information regarding a person's contacts.**

HHC **NYCHHC HIPAA Authorization to Disclose Health Information**

**ALL FIELDS MUST BE COMPLETED**

**THIS FORM MAY NOT BE USED FOR RESEARCH OR MARKETING, FUNDRAISING OR PUBLIC RELATIONS AUTHORIZATIONS**

| PATIENT NAME/ADDRESS | DATE OF BIRTH | PATIENT SSN |
|---|---|---|
| Erick Encarnacion<br>1068 Walton Ave Apt 2B | 08-06-97 | 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 |
| | MEDICAL RECORD NUMBER | TELEPHONE NUMBER |

| | |
|---|---|
| NAME OF HEALTH PROVIDER TO RELEASE INFORMATION<br>Belvieu hos<br>BELLEVUE HOSPITAL | SPECIFIC INFORMATION TO BE RELEASED:<br>Information Requested ____<br>Treatment Dates from 9-4-2023 to 11-20-2025 |
| NAME & ADDRESS OF PERSON OR ENTITY TO WHOM INFO. WILL BE SENT<br>ANDRES M. ARANDA<br>930 GRAND CONCOURSE, 1A<br>BRONX, NY. 10451 | INFORMATION TO BE RELEASED (If the box is checked, you are authorizing the release of that type of information). **Please note: unless all of the boxes are checked, we may be unable to process your request.**<br>☐ Alcohol and/or Substance Abuse Program Information ☐ Mental Health Information<br>☐ Genetic Testing Information ☐ HIV/AIDS-related Information |
| REASON FOR RELEASE OF INFORMATION<br>☒ Legal Matter ☐ Individual's Request<br>☐ Other (please specify): ____ | WHEN WILL THIS AUTHORIZATION EXPIRE? (Please check one)<br>☒ Event: SETTLEMENT OF LAWSUIT ☐ On this date: ____ |

I, or my authorized representative, authorize the use or disclosure of my medical and/or billing information as I have described on this form.

I understand that my medical and/or billing information could be re-disclosed and no longer protected by federal health information privacy regulations if the recipient(s) described on this form are not required by law to protect the privacy of the information.

I understand that if my medical and/or billing records contain information relating to **ALCOHOL** or **SUBSTANCE ABUSE, GENETIC TESTING, MENTAL HEALTH**, and/or **CONFIDENTIAL HIV/AIDS RELATED INFORMATION**, this information will not be released to the person(s) I have indicated unless I check the box(es) for this information on this form.

I understand that if I am authorizing the use or disclosure of HIV/AIDS-related information, the recipient(s) is prohibited from using or re-disclosing any HIV/AIDS-related information without my authorization, unless permitted to do so under federal or state law. I also understand that I have a right to request a list of people who may receive or use my HIV/AIDS-related information without authorization. If I experience discrimination because of the use or disclosure of HIV/AIDS-related information, I may contact the New York State Division of Human Rights at 212.480.2493 or the New York City Commission of Human Rights at 212.306.7450. These agencies are responsible for protecting my rights.

I understand that I have a right to refuse to sign this authorization and that my health care, the payment for my health care, and my health care benefits will not be affected if I do not sign this form. I also understand that if I refuse to sign this authorization, NYCHHC cannot honor my request to disclose my medical and/or billing information.

I understand that I have a right to request to inspect and/or receive a copy of the information described on this authorization form by completing a Request for Access Form. I also understand that I have a right to receive a copy of this form after I have signed it.

I understand that if I have signed this authorization form to use or disclose my medical and/or billing information, I have the right to revoke it at any time, except to the extent that NYCHHC has already taken action based on my authorization or that the authorization was obtained as a condition for obtaining insurance coverage.

To revoke this authorization, please contact the facility Health Information Management department processing this request.

***I have read this form and all of my questions have been answered. By signing below, I acknowledge that I have read and accept all of the above.***

| SIGNATURE OF PATIENT OR PERSONAL REPRESENTATIVE | IF NOT PATIENT, PRINT NAME & CONTACT INFORMATION OF PERSONAL REPRESENTATIVE SIGNING FORM |
|---|---|
| Erick Encarnacion | |
| DATE<br>05-29-2025 | DESCRIPTION OF PERSONAL REPRESENTATIVE'S AUTHORITY TO ACT ON BEHALF OF PATIENT |

**If HHC has requested this authorization, the patient or his/her Personal Representative must be provided a copy of this form after it has been signed.**

| HHC USE ONLY | |
|---|---|
| Date Received: | Initials of HIM employee processing request: |
| Date Completed: | Comments: |

EXHIBIT E

**U.S. Department of Justice**

Federal Bureau of Prisons

*Northeast Regional Office*

*Via Certified and Return Receipt Mail*

*U.S. Custom House-7th Floor*
*2nd & Chestnut Streets*
*Philadelphia, PA 19106*

April 20, 2026

Andres M. Aranda, Esq.
Attorney-at-law Abogado
930 Grand Concourse, Suite 1A
Bronx, NY 10451

Re: Administrative Claim No. TRT-NER-2025-08696
Your Client, Erick Encarnacion

Dear Mr. Aranda:

Administrative Claim No. TRT-NER-2025-08696, properly received on August 20, 2025, has been considered for settlement as provided by the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2672, under authority delegated to me by 28 C.F.R. § 543.30. Damages are sought in the amount of $100,000,000.00 based on a personal injury claim. Specifically, you allege, Erick Encarnacion was injured as a result of being shot by a staff member employed by the Bureau of Prisons.

At this time, there is not sufficient evidence to substantiate the allegations of this claim. There is no evidence Erick Encarnacion experienced a compensable loss as the result of negligence on the part of any Bureau of Prisons employee. Accordingly, Erick Encarnacion's claim is denied.

If you are dissatisfied with this decision, you may bring an action against the United States in an appropriate United States District Court within six (6) months of the date of this letter.

Sincerely,

A. M. Johnson
Regional Counsel

cc: A. Frazier, Acting Warden, MDC Brooklyn